# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| DARRELL DAVIDSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-CV-152 |
| | ) | |
| CARAVAN FACILITIES MANAGEMENT, | ) | |
| L.L.C., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on the motion for summary judgment filed by Defendant Caravan Facilities Management, L.L.C. (ECF 20). Plaintiff Darrell Davidson filed a response in opposition (ECF 26) and Caravan filed a reply (ECF 28). For the reasons explained below, the motion is GRANTED. The Clerk of the Court is instructed to enter judgment in favor of the Defendant and against the Plaintiff.

## BACKGROUND

Darrell Davidson filed this lawsuit against Caravan, his former employer, in state court and Caravan removed the case to this Court. Complaint (ECF 4); Notice of Removal (ECF 1). Davidson says he "was employed by [Caravan] from on or about June 28, 2008, until his wrongful termination on or about June 13, 2017." Complaint, p. 2. Davidson alleges that during his employment he "was often singled out for disparagement and racial slurs by coworkers and/or management[]"; that he "receiv[ed] less pay over-all than similarly situated employees outside of his protected categories[]"; that he "was treated more harshly by Defendant[,] . . . was denied tools needed for completion of duties, then over-scrutinized and disciplined more harshly than

similarly situated employees for the same or substantially same performance issues[]"; and that Caravan "repeatedly denied the Plaintiff promotions and pay raises that he had earned, passing him over and giving promotions and raises to similarly situated and/or less qualified individuals." *Id*., p. 3. Caravan fired Davidson on June 13, 2017, purportedly "because of attendance issues." *Id*., p. 4. Davidson, however, "contends that the proffered reason for termination was false and pretextual[]" and that Caravan "discriminated against and retaliated against [him] on the basis of his color/race (black/African-American) and sex (male), and/or because he protested discriminatory treatment in the workplace." *Id*., p. 4. Davidson seeks "judgment against the Defendant for compensatory damages, punitive damages, [and] reasonable attorney's fees and costs[.]" *Id*.

Caravan denies Davidson's allegations, insisting that Davidson was not subjected to discriminatory treatment during his employment and that he was terminated for legitimate, non-discriminatory reasons. Answer to Complaint (ECF 11), generally. In its brief in support of its motion, Caravan summarizes its arguments as follows:

> Davidson presents no *admissible* evidence of racial or sexual harassment; . . . Davidson also never complained of the alleged harassment he experienced, so there is no basis for employer liability. His failure to promote claim fails because Davidson cannot demonstrate that the individuals hired into the jobs he sought were less qualified than him. In fact, each was *more* qualified than him. Davidson's disparate pay claim is likewise factually baseless: Davidson was paid *more* than most of the other shift supervisors, including those outside of his protected classes. With respect to his discriminatory discharge claim, the evidence shows he was terminated for legitimate attendance issues. . . . Finally, his retaliation claim fails because none of the managers who were involved in the personnel actions he complains of were aware of his alleged protected activity.

Defendant's Brief in Support of Motion for Summary Judgment (ECF 21), p. 2 (italics in original). Caravan contends that "Davidson has no evidence to rebut these facts[]" and "the Court

should grant Caravan's motion for summary judgment." *Id.*

## SUMMARY JUDGMENT STANDARD

Federal Rule 56 states that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The Supreme Court has explained that "the burden on the moving party may be discharged by 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "'If the moving party has properly supported his motion, the burden shifts to the non-moving party to come forward with specific facts showing that there is a genuine issue for trial.'" *Simpson v. Gen. Dynamics Ordnance & Tactical Sys.-Simunition Operations, Inc.*, 2019 WL 6912332, at *2 (N.D. Ind. Dec. 19, 2019) (quoting *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015)). Within this context, the Court must construe all facts and reasonable inferences from those facts in the light most favorable to the nonmoving party. *Id.* (citing *Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 550 (7th Cir. 2017)). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Summary judgment is not a substitute for a trial on the merits nor is it a vehicle for resolving factual disputes. *Id.* Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975

F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989).

If it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish

his or her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S.

at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003).

"Summary judgment is a critical moment for a non-moving party. It must 'respond to the

moving party's properly-supported motion by identifying specific, admissible evidence showing

that there is a genuine dispute of material fact for trial.'" *Johnson v. Advocate Health & Hosps.*

*Corp.*, 892 F.3d 887, 893-94 (7th Cir. 2018) (quoting *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562,

568 (7th Cir. 2017)). "Inferences supported only by speculation or conjecture will not suffice."

*Id.* (citing *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 721-22 (7th Cir. 2018)). "Neither will the

mere scintilla of evidence." *Id.* (citing *Grant*, 870 F.3d at 571).

The Seventh Circuit in recent years has refined the summary judgment standard of review

in employment discrimination cases, explaining as follows:

> On top of the normal lattice of summary judgment demands, we must also apply
> the constructs of employment discrimination law. For years we have tangled with
> a "rat's nest of surplus tests" in employment discrimination cases–struggling to
> pigeon hole evidence into the direct or indirect method with various overlaying
> requirements of "convincing mosaics" and circumstantial or direct evidence. *Ortiz*
> *v. Werner Enters., Inc.*, 834 F.3d 760, 764-66 (7th Cir. 2016). Our Circuit has
> now clarified the singular question that matters in a discrimination case:
> "[W]hether the evidence would permit a reasonable factfinder to conclude that the
> plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the
> discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765. "Evidence
> must be considered as a whole, rather than asking whether any particular piece of
> evidence proves the case by itself. . . . Relevant evidence must be considered and
> irrelevant evidence disregarded." *Id.*

*Johnson*, 892 F.3d at 893-94.

**DISCUSSION**

**I. Hostile work environment claim.**

Davidson's factual assertions are set out in his Charge of Discrimination, attached to his

Complaint as Exhibit A (ECF 4, pp. 6-8) and included in his Appendix (ECF 27) as Exhibit 1.

Davidson bases his hostile work environment claim on the following allegations:

> 1) During his employment, [Davidson] was often singled out for disparagement
> and racial slurs by coworkers and/or management. For example, on or about
> August 11, 2014, he was told by a fellow employee that the only reason he was
> promoted to management was that "they needed to put a n-gger in there."
> [Davidson] was also called a "fat ass" and a "drug dealer" by coworkers, because
> of his race. In other instances, [Davidson] was called disparaging names by his
> supervisors, such as Tammy Laws and Lori Snyder. This disparagement was
> witnessed by [Davidson's] coworker Betty Bernau.
>
> 2) [Davidson] was a salaried employee even though, by information and belief,
> similarly situated non-black/non-African American and female employees were
> paid on an hourly basis. As a result of [Davidson's] salaried status, he was
> frequently required to work longer hours per week, while receiving less pay over-
> all than similarly situated employees outside of his protected categories.
> [Davidson], for example, often worked six days a week, when his similarly
> situated coworkers did not; plus [Davidson] received no over-time pay whereas
> similarly situated employees outside of his protected categories, who were
> otherwise classified as "hourly," were eligible for over-time pay and/or were
> compensated at a higher rate than [Davidson], in spite of performing the same
> work. [Davidson] requested on numerous occasions to be returned to an hourly
> pay instead of a salary pay or to be compensated at the same rate as similarly
> situated non-black and/or female employees, but [Caravan] denied his requests.
>
> 3) [Davidson] was treated more harshly by [Caravan]; he [was] denied tools
> needed for completion of duties, then over-scrutinized and disciplined more
> harshly than similarly situated employees for the same or substantially same
> performance issues. [Davidson], for example, was expected to complete audits,
> but [Caravan] denied him the tools he need to complete his audits. On or about
> July 2, 2015, [Davidson] was not given the tools to complete his audit, and when
> he asked for the tools, he needed for this, [Caravan] disciplined him for not
> completing the audit. Yet a similarly situated Caucasian female employee named
> Sue Martin was not even written up when she failed to complete her audit.

4) In another instance, on or about December 29, 2016, [Caravan] wrote up [Davidson] for failing to use a vacuum to clean a booth while similarly situated employees who failed to vacuum booths were not disciplined by [Caravan].

Plaintiff's Appendix, pp. 12-13 (quoting Charge of Discrimination, Exh. B). In his response brief, Davidson summarizes his hostile work environment claim as follows:

Simultaneous to these references [i.e., the alleged statements that Davidson was a "n----r," "fat-ass," and "drug dealer] Plaintiff was passed over for promotion, he was unfairly written up for things for which his white counterparts were not written up, and ultimately, he was discharged under suspicious circumstances regarding the questionable application of the attendance policy. Accordingly, Davidson argues that he was: 1) subjected to unwelcome harassment; 2) the harassment was based upon his race and color; 3) the harassment was severe and/or pervasive and created a hostile or abusive situation; and 4) there is basis for employer liability. . . . Plaintiff's racially hostile work environment is further bolstered by the companion evidence of three bogus written warnings, four nit-picking emails about his daily reports, and being subjected to "pop-up audits" by [supervisors].

Plaintiff's Response in Opposition to Summary Judgment, pp. 2-3.

Caravan argues that Davidson's hostile work environment claim fails because he "cannot establish that the harassment he allegedly experienced was based on his race or gender[,]" (Defendant's Brief in Support, p. 4), that the alleged statements made about him are inadmissible hearsay (*id*.), that the disciplinary actions taken against him were "all on their face neutral personnel actions[]" (*id*., p. 6), and that the harassment Davidson claims he endured was not sufficiently severe or pervasive to support a hostile work environment claim (*id*., p. 8). Caravan notes that according to Davidson's own testimony in his deposition, he "alleges that he was subjected to a hostile work environment by various members of Caravan's management in the following ways: [d]isparaging comments; [t]hree written warnings; [f]our 'nit-picky' emails about his daily reports; [b]eing 'blamed' for uncompleted work and counseled on this issue; and

[s]even to nine 'pop-up' audits." *Id*. (citing Davidson Deposition, (ECF 21-2)). These

allegations, argues Caravan, are insufficient to support a claim of a racially hostile environment.

### A. Racial epithet and disparaging comments.

As to the alleged disparaging comments (i.e., the alleged use of the "N" word and the

alleged references to Davidson as a "fat ass" and "drug dealer,") Caravan contends that "[o]nly

one of these statements is directly racial (and none has anything to do with gender). In any event,

each statement is clearly hearsay because they are being offered to prove that Steiner actually

made these comments about Davidson."[1] *Id*. Moreover, it is undisputed that the alleged

comments were not made directly to Davidson, but were relayed to him "in August 2014" when

"two non-management employees told him that Steiner said the following about him: (1)

Davidson was only promoted to management because they 'needed to put a n----r in there';

Davidson was a 'fat ass that couldn't take care of simple tasks'; and (3) Davidson was a 'drug

dealer.'" *Id*. (Caravan states that "Steiner denies making any such statements." *Id*., n. 2.)

Caravan argues that since the alleged derogatory comments were not made directly to

Davidson, but rather communicated to him by coworkers, they are hearsay and "[h]earsay is

inadmissible and may not be used to defeat summary judgment." *Id*., p. 4. Davidson insists that

the "statements were relayed to Mr. Davidson, as they were spoken about him in the work place

and are evidence of the culture of his place of employment. Whether second hand or not, these

statements were made by a manager/supervisor, and therefore, they were made by an agent of

Caravan and are not hearsay comments." Plaintiff's Response Brief, p. 3. In its reply brief,

---

[1] "Lori Steiner (nee Snyder) [was] the Assistant Area Manager at the time." Caravan Statement of Material Facts (ECF 21-1), p. 2. She is alternatively referred to in the pleadings as Steiner or Snyder.

Caravan argues that Davidson misinterprets and misapplies the law regarding hearsay:

> Presumably, Davidson is arguing that these statements are party admissions under Federal Rule of Evidence 801(d)(2)(D). But the statements Davidson heard were *not* made by a manager or supervisor, they were made by hourly employees who had no supervisory authority over him. Thus, the statements are hearsay. *See Johnson v. Advocate Health & Hosps. Corp*., 892 F.3d 887, 902-03 (7th Cir. 2018) (comments the plaintiffs were told supervisors had made (by non-supervisory employees) is hearsay and cannot be sued to prove that the supervisors made the comments); *Stephens v. Erickson*, 569 F.3d 779, 793 (7th Cir. 2009) (comments made by an administrative assistant about what a management-level employee allegedly said were hearsay because her duties were not related to "the decisionmaking process affecting the employment action"); *Wishoff v. City of Madison*, 2014 U.S. Dist. LEXIS 136653 *4 (W.D. Wisc. Sept. 27, 2014) ("rank gossip" by non-management employees is inadmissible hearsay).[2]

Defendant's Reply Brief (ECF 28), p. 3.

In *Johnson, et al. v. Advocate Health*, the plaintiffs presented the same argument Davidson presents now: asserting that derogatory comments allegedly made about them by supervisors, which plaintiffs were told about by other employees, should be deemed admissible under Federal Rule of Evidence 801(d)(2)(D). The Seventh Circuit explained as follows:

> Advocate also argues that Johnson's report of what [other employees] told him is hearsay. Johnson retorts that this is a statement by the defendant's employee on a matter within the scope of that employee's relationship with Advocate and thus not hearsay pursuant to the exclusions enumerated in Federal Rule of Evidence 801(d)(2)(D). It is unlikely, however, that this statement falls within the exclusion of Rule 801(d)(2)(D). In order to be excluded, the declarant must be involved in the "decisionmaking process affecting the employment action." *Simple v. Walgreen Co.*, 511 F.3d 668, 672 (7th Cir. 2007). These declarants were not.

*Johnson*, 892 F.3d at 896. And in *Erickson* the Seventh Circuit explained as follows:

> Admissions by a party-opponent are governed by Rule 801(d)(2)(D) of the Federal

---

[2] The Court was unable to locate the case of *Wishoff v. City of Madison* cited by Caravan. But the other cases it cites–including *Johnson v. Advocate* and *Stephens v. Erickson*–and additional cases cited and discussed by the Court, support Caravan's argument on this point.

> Rules of Evidence, which provides that "[a] statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." . . . For an agent's statement regarding an employment action to constitute an admission, she need not have been personally involved in that action, but her duties must encompass some responsibility related to "the decisionmaking process affecting the employment action."

*Stephens v. Erickson*, 569 F.3d 779, 793 (7th Cir. 2009) (quoting *Simple v. Walgreen Co.*, 511 F.3d 668, 672 (7th Cir. 2007)). So it is in this case. The comments Davidson was told were made in reference to him are inadmissible hearsay. The comments were not made directly to Davidson or even in his presence. The employees who relayed those comments to Davidson were not his supervisors or managers, nor did they have anything to do with the alleged discriminatory actions taken against him by Caravan. (And neither did Steiner, who allegedly uttered the offensive remarks, as discussed below.) Thus, the comments are not excluded from the hearsay rule, are inadmissible, and cannot be used by Davidson to defeat summary judgment.

But all of this discussion is largely academic in this case. Davidson is attempting to include Steiner's alleged derogatory remarks as evidence to support his hostile work environment claim. Even assuming for the sake of argument that the remarks are admissible, they do not save Davidson's hostile work environment claim because he fails to muster evidence to establish that the racial or gender discrimination he says he suffered was "so severe or pervasive as to alter the conditions of his employment." In other words, Davidson fails to establish an element of his claim. In this respect, this case is similar to another employment case in which this Court explained as follows:

> Although inadmissible hearsay, the Court notes that [a supervisor's] alleged statement outside the presence of [plaintiff] that he was a "dumb ass nigger" is

particularly egregious. The Court recognizes, as the Seventh Circuit has held, that "[p]erhaps no single act can more quickly alter the conditions of employment and create an abusive working environment . . . than the use of an unabmiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) (quotation and citations omitted). However, in *Rodgers*, the plaintiff's supervisor used this word in the plaintiff's presence twice. This Court certainly does not condone [the supervisor's] alleged use of this word, which is undeniably a pejorative racial epithet, but recognizes that in this case, the word was allegedly only stated once about Plaintiff, in his absence. The use of this term could of course contribute to a hostile work environment. However, in this case, the small number of harassing remarks based upon Plaintiff's race, spread out over approximately five years, coupled with the fact that most of the remarks were made outside of Plaintiff's presence, leads this Court to believe that the remarks are not severe or pervasive enough to be judged objectively hostile.

*Cain v. Elgin, Joliet & E. Ry. Co.*, 2006 WL 163010, at *12 (N.D. Ind. Jan. 19, 2006); *see also*, *Barnett v. Certified Grocers Midwest, Inc.*, 1997 WL 639214, at *24 (N.D. Ill. Oct. 6, 1997) ("Although Plaintiff describes several incidents where white employees referred to blacks as 'niggers,' however, he has offered no non-hearsay evidence of any such incidents, nor has he personally been called a 'nigger' or other racially derogatory term. These allegations cannot support Plaintiff's claim of race harassment."). For the same reasons, Davidson's assertion that Steiner used a racial epithet and two other pejorative terms ("fat ass" and "drug dealer") when referring to Davidson–on one occasion and outside of his presence–is insufficient to support his hostile environment claim.

**B. Disciplinary actions and criticism.**

Davidson also claims that he was subjected to a racially hostile work environment because he 1) was disciplined unfairly when he was given "write-ups" on three occasions, 2) was criticized unfairly on four occasions for alleged problems with his daily reports, and 3) was subjected to "pop-up audits." Caravan maintains that the write-ups, criticisms and audits were

legitimate actions and did not render Davidson's work environment racially hostile.

**1. Three written warnings.**

According to Davidson's deposition testimony, the write-ups he received on three occasions were as follows:

1) On July 7, 2015, he received a written warning from Mindy Ratty, the Sanitation Manager at the time, for failing to complete his weekly audits. Davidson Deposition, Exh. A (ECF 21-2), p. 51.

2) On December 29, 2016, he received a written warning from Omid Zahedi, who had replaced Ratty as Sanitation Manager, for failing to use a "call-in sheet"–a list of employees who are to be called in by shift supervisors (such as Davidson) to cover for other employees who were absent from work. *Id*., Exh. 14, p. 57.

3) On January 3, 2017, he received a written warning from Zahedi for failing to review the quality of work performed by his shift team. *Id*., Exh. 11, p. 52.

As to the first write-up, Davidson conceded that he had not completed his audits for the week, but claimed he was unable to do so because the iPad he needed to complete the audits was unavailable. Davidson testified as follows:

> When it was time for me to do my audits, the iPad came up missing, and nobody knew where it was. So I didn't complete my audits because it was based off the inputting into the iPad[.] And two days later, the iPad shows up, and [Mindy Ratty] said that she forgot it was in her possession at home.

*Id*., p. 16. Davidson further acknowledged that the missing iPad prevented two other supervisors, both Caucasian, from completing their audits, but claimed that "nobody got wrote up but me."

*Id*., p. 17. As to the second write-up, Davidson conceded that he did not utilize the "call-in sheet"

to call employees to cover for workers who were absent on given days, but claims he did not do so because he "had enough people to cover my shift on certain nights." *Id.*, p. 21. Davidson testified that "[b]y me being the third-shift supervisor, us being on third shift, people didn't want to come in. So I had about two or three people that I could call and rely on. I exercised [sic] those people, but some people I didn't call. . . . So I called the people that did want to come in. So the people that didn't get called, they filed grievances demanding to be paid for the days that they missed. And I was ultimately blamed [written-up] for that." *Id.* Notably, Davidson presents no evidence that this write-up had anything to do with his race or gender. He simply implies it, and wants the Court to infer it, by claiming that he was the only shift supervisor written up for this offense. In his deposition, however, he testified that he "can't recall" whether other supervisors were calling employees listed on the spreadsheet. Davidson Deposition (ECF 21-2), p. 22.

Finally, as to his third written warning, Davidson testified that it was unfair because he and his team did not fail to perform their duties properly on that occasion, and did not leave debris in an area they were responsible for cleaning. *Id.*, p. 20. Davidson opined that the materials or debris he and his team were accused of ignoring "could have been built up after we left" the area by "[t]rucks [that] continuously go through there. . . . When I signed off on the cleaning, everything was complete." *Id.* So, Davidson insists that this write-up was unfair because the debris left at a site that Davidson and his team were responsible for was *not* left by him or his employees. Nonetheless, Davidson was issued a written warning by Sanitation Manager Omid Zahedi (who succeeded Mindy Ratty and was of Middle Eastern descent, *see* Defendant's Statement of Material Facts, p. 4).

## 2. Emails criticizing Davidson's work.

As further evidence of what he argues was a racially hostile environment, Davidson points to four emails he received from Daniel Tingley, a Caucasian site manager. Defendant's Brief in Support, Exh. B (ECF 21-3). Those very short emails question whether Davidson, on four occasions, failed to complete all of his responsibilities. *Id.* They do not contain any references to race or gender, are not disciplinary write-ups, and do not threaten or impose any adverse employment actions. In one of those emails, dated January 13, 2017, Tingley writes as follows: "Simple math. I am not sure why this is so difficult to get right? If my weekly total is 6, why does it say 5 were closed but 6 PM's are listed? How hard is this? Attention to detail is a key component in being a supervisor." *Id.*, p. 3. Davidson forwarded this email to another employee and stated: "This is my site director attempt [sic] to belittle me. I'm pretty sure other supervisors make mistakes. My question is do the[y] receive emails such as this?" *Id.*, p. 2. Davidson forwarded another of Tingley's emails to a supervisor and asked: "Is Daniel Tingley Watching my shift ends Only?–Is this Considered harassment?" *Id.*, p. 9. Another time, Davidson took issue with one of Tingley's emails and forwarded it to supervisors with the comment: "Knit [sic] Picking!!!!!!!!!!!!" *Id.*, p. 12 (exclamation points in original).

Clearly, Davidson took issue with Tingley's emails questioning Davidson's job performance on four occasions, and felt that the emails were nit-picky and amounted to "harassment." Davidson presents no evidence that the emails, even assuming they were "nit picky" as he asserts, had anything to do with race or gender. He does not allege that other, similarly situated shift supervisors not in his protected class were treated more favorably (e.g., that they had similar performance issues but were not questioned about them). Instead, Davidson

apparently wants the Court (and a jury) to infer that the emails were racially motivated because they were sent by a supervisor who was white.

### 3. "Pop-up" audits.

Finally, Davidson contends that he was unfairly subjected to "pop-up" audits of his work. On this point, Davidson testified as follows:

> Q. Any other way you believe you were treated more harshly?
>
> A. I would be subject to–as a third-shift supervisor, it was common–it was kind of like an inside joke, but management such as Daniel or Roger, when he took over, or Lori, would do pop-up audits in the middle of the night on third shift. I was the only supervisor that was subject to these audits. When I spoke to the other supervisors, they said, no, they've never ridden around on a cart with Daniel or Lori when they went to certain areas looking for what work hasn't been done and what work has been done. . . . So it seemed like that my job and my work that was being done was under a microscope each and every night.

Davidson Deposition (ECF 21-2), p. 19. That is the sum and substance of Davidson's "evidence" that the "pop-up audits," which he was subjected to about half a dozen times, were part of the racially hostile environment in which he worked.

To recap his factual allegations, Davidson insists that his "racially hostile work environment claim is . . . bolstered by the companion evidence of three bogus written warnings, four nit-picking emails about his daily reports, and being subjected to 'popup audits' by [his supervisors]." Plaintiff's Response Brief, p. 3. Davidson argues that his "allegations constitute severe or pervasive harassment. The disparaging statements–use of the 'N' word, being a drug dealer, being fat ass, and 'dumb'–must be taken in the context of all the employment actions suffered by Mr. Davidson. Taken together, even if they did occur over several months or several years, they are evidence of a discriminatory and harassing atmosphere in which Plaintiff had to

14

work." *Id.*, pp. 3-4.

The evidence Davidson presents does not come close to establishing that he was subject to a hostile work environment due to his race or his gender. While he clearly felt that his superiors were "picking" on him or scrutinizing his work too closely, and that he received write-ups for performance issues when in his opinion he had done nothing wrong, that is insufficient to even raise a genuine fact issue about his hostile work environment claim. It is well-established, of course, that a plaintiff's subjective belief that he was discriminated against is insufficient to survive summary judgment, as are arguments based on speculation and conjecture. As the Seventh Circuit concluded in *Johnson*:

> Johnson also disputes the motivations behind his termination claiming that management unfairly criticized him, held him to unfair standards, nitpicked and micromanaged. This evidence cannot support a claim for race discrimination unless he can set forth some evidence that similarly situated non-African-American employees were not treated in the same manner. A supervisor who nitpicks, micromanages, and holds employees to unreasonable standards is simply a bad boss. It is only if she applies this poor management unequally based on race that a plaintiff has a claim for race discrimination.

*Johnson v. Advocate Health*, 892 F.3d at 899. It is the same here. The *only* allegation Davidson makes that he was treated unequally on the basis of his race and gender is his contention that two white shift supervisors–one male and one female–did not receive written warnings for having failed to complete their audits when the iPad used to do so was missing for two days. But even assuming that is true, it is still insufficient to establish that he was subjected to a hostile work environment.

Turning again to the Seventh Circuit's opinion in *Johnson*, the appellate court explained the elements and burden of proof for a hostile work environment claim as follows:

15

To state a claim for discrimination based on a hostile work environment, the plaintiffs must show that (1) they were subject to unwelcome harassment; (2) the harassment was based on their race; (3) the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability. *Alamo v. Bliss*, 864 F.3d 541, 549 (7th Cir. 2017). The conduct alleged must be "sufficiently severe or pervasive to alter the conditions of employment." *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009). Whether conduct meets this bar depends on "the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance." *Id.*; *see also Milligan-Grimstad v. Stanley*, 877 F.3d 705, 714 (7th Cir. 2017). Sometimes our cases phrase the test differently, looking instead for evidence that the workplace was both subjectively and objectively offensive–either in lieu of the first prong–that the employee was subject to unwelcome harassment–or the third prong–whether the harassment was severe or pervasive enough to rise to the level of a hostile work environment. *See Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 896 n.6 (7th Cir. 2016), *cert. denied*, – U.S. –, 137 S.Ct. 1614, 197 L.Ed.2d 708 (2017). In the end, we have concluded that the inquiry is the same. *Id.*

We expect a certain level of maturity and thick skin from employees. "Offhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment." *Passananti v. Cook Cty.*, 689 F.3d 655, 667 (7th Cir. 2012). "Discrimination laws do not mandate admirable behavior from employers, through their supervisors or other employees. Instead, the law forbids an employer from creating an actionably hostile work environment for members of protected classes." *Russell v. Bd. of Trs. of Univ. of Ill. at Chicago*, 243 F.3d 336, 343 (7th Cir. 2001). As the dissent rightfully points out, the environment need not reach the point of "hellishness," as some cases once argued. The Supreme Court standard dictates that the discrimination must be only so severe or pervasive so as to affect the terms and conditions of employment. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

*Johnson v. Advocate Health*, 892 F.3d at 900-01. In its reply brief, Caravan summarizes its argument on this issue and cites several cases in support:

Davidson also argues the comments are "bolstered" by evidence of "three bogus written warnings, four nit-picking emails about his daily reports, and being subjected to pop-up audits. To put this "evidence" into perspective, Davidson was employed as the third shift supervisor from October 2014 to June 13, 2017, or over two and a half years. . . . During this time, Davidson was issued three written

warnings (one in 2015, one in 2016, and one 2017), was sent four emails he considered "nit-picky" from his supervisor, and was subject to seven to nine "audits." Even if Davidson had presented evidence that these instances were related to his race or gender, no reasonable jury could conclude these infrequent actions over two and a half years constitute severe or pervasive conduct. *See, e.g. Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 564-65 (7th Cir. 2009) (repeated critiques of the plaintiff's job performance over multiple years did not amount to "demeaning, degrading, or hostile behavior" sufficient to form a hostile work environment); *King v. Steinberg*, 2017 U.S. Dist. LEXIS 208612 *26 (W.D. Wis. Dec. 19, 2017) (one day suspension combined with criticisms of the plaintiff's professionalism and behavior would not allow a reasonable person to find conduct severe or pervasive); *Bowdon v. Kirkland & Ellis LLP*, 2010 U.S. Dist. LEXIS 91730 *38 (N.D. Ill. Sept. 2, 2010) (the plaintiff's testimony that she was unfairly criticized by her superiors, given unfavorable work assignments, and treated coldly by her co-workers insufficient to constitute a hostile work environment).

Defendant's Reply Brief, pp. 4-5. *See also*, *Hilt–Dyson v. City of Chicago*, 282 F.3d 456, 463-64 (7th Cir. 2002) (plaintiff's subjective belief that workplace incidents were demeaning and degrading insufficient to create actionable harassment under Title VII).

The Court agrees with Caravan. The allegations and evidence on which Davidson bases his claim, even when taken as true and after drawing reasonable inferences in his favor, are not sufficient to establish that he was subjected to racial or gender discrimination "so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment." Since Davidson fails to establish an essential element of his claim, "summary judgment is not only appropriate, but mandated. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003).

**II. Failure to promote claim and disparate pay claim.**

**A. Failure to promote.**

Regarding his claims that he was passed over for promotions and received disparate pay

due to his race or gender, Davidson alleges as follows:

> [Caravan] also repeatedly denied [Davidson] promotions and pay raises that he had earned, passing him over and giving promotions and raises to similarly situated and/or less qualified individuals outside of [Davidson's] protected categories. On one such occasion, for example, on or about February 13, 2017, [Davidson] applied for an HSKP management position, but was denied the position (and any increased benefits that would go with it) even though he was qualified for the position. [Davidson] was given no reason for the denial.

Plaintiff's Appendix, p. 13 (quoting Plaintiff's Charge of Discrimination). Davidson further argues:

> Plaintiff had sought to be promoted to Housekeeping Manager. However, he was repeatedly passed over on several occasions. Mindy Rattay, [an] outside hire who had no housekeeping experience was promoted into the job. After Mindy Rattay, then Omid Zahedi got the job. And then after Omid Zahedi, Roger Sierra got the job (non-Black/Hispanic). The point is that other persons besides Plaintiff got the job of Housekeeping Manager, when he was the most qualified and most experienced.

*Id.*, p. 9 (internal citations to record omitted).

"To demonstrate a prima facie case for failure to promote, a plaintiff must produce evidence showing that: (1) she was a member of a protected class; (2) she was qualified for the position sought; (3) she was rejected for the position; and (4) the employer promoted someone outside of the protected class who was not better qualified for the position." *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 892 (7th Cir. 2016) (citing *Jaburek v. Foxx*, 813 F.3d 626, 631 (7th Cir. 2016)). "Summary judgment for the employer is appropriate if the employee fails to establish any of the elements of a prima facie case for failure to promote." *Id.* (citing *Atanus v. Perry*, 520 F.3d 662, 673 (7th Cir. 2008)).

Caravan argues that "Davidson has presented no direct or circumstantial evidence of discrimination. Instead, he points to the fact that the three individuals who were hired over him

are outside of his protected class. But to set forth a *prima facie* case, Davidson must show that he was as qualified or more qualified for the Sanitation Manager position than Ratty, Zahedi, and/or Sierra. Based on the evidence in the record, he cannot do so." Brief in Support, p. 13.

**1. Promotion of Mindy Ratty.**

Caravan argues that Ratty was more qualified than Davidson at the time she was hired as Sanitation Manager. Caravan states as follows:

> Prior to becoming the Shift Supervisor in late 2014, Davidson did not have any supervisory or management experience. Davidson also does not have a college degree. Thus, when he applied for the position in January 2015, he had very little management experience, having just assume the role of Shift Supervisor. Ratty, on the other hand, had five years of management experience, including district management experience supervising other management employees, and a Bachelor's degree in Business Administration and Management from Indiana Wesleyan University. These are important qualifications for the Sanitation Manager, whose main responsibility is to manage the Shift Supervisors.

Brief in Support, p. 13 (citing to Declaration of Lori Steiner). Caravan argues that "Davidson, therefore, cannot establish that he was as or more qualified than Ratty, and even if he could, he has no evidence to demonstrate that Caravan's evidence showing that Ratty was hired over Davidson because of these qualifications is pretext for discrimination." *Id.* (citing *Riley*, 829 F.3d at 893-94) (hiring someone whom the employer believes is better qualified for the position is a legitimate, non-discriminatory reason for the action); *Hobbs v. City of Chicago*, 573 F.3d 454, 462 (7th Cir. 2009) (evidence of the plaintiff's qualifications "only would serve as evidence of pretext if the differences between [the plaintiff] and [the person hired] were so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue.").

Davidson asserts that he *was* better qualified than Ratty, even though he concedes that he does not have a college degree. Davidson states that "[w]hile Plaintiff does not have a college degree, he did have in-house supervisory/management experience at Caravan. Plaintiff was selected to go around the country at different facilities and train individuals. Furthermore, Plaintiff trained Ratty, Zahedi, and Sierra–the people who got the promotions over him. Therefore, Plaintiff maintains that he should have been selected over these individuals, but he wasn't because of his race and color."[3] Plaintiff's Response, p. 5.

In its reply brief, Caravan retorts by reiterating that "Ratty had five years of management experience, including district management experience supervising other management employees, and a Bachelor's degree in Business Administration and Management. At the time Ratty was promoted in January 2015, Davidson had *just* been promoted to shift supervisor, and had no prior management experience, nor did he have a degree." Defendant's Reply, p. 6. Caravan slams the door on Davidson's failure to promote claim by pointing out that "[s]imply because Davidson believes he was more qualified than Ratty [or Zahedi or Sierra] does not make it true, nor would

___

[3] As Caravan points out, Davidson's failure to promote claim, as it pertains to the promotions of Ratty and Zahedi, can be based only on race discrimination, not gender discrimination. Caravan correctly notes (and Davidson does not dispute this point) that "Davidson filed his charge of discrimination against Caravan on July 7, 2017, more than 300 days after Ratty and Zahedi were promoted. These Title VII claims are, therefore, untimely and are subject to summary judgment." Brief in Support, p. 12. Caravan also points out that "[a]lthough the decision to promote Roger Sierra over Davidson (in March 2017) is timely under Title VII, Caravan promoted a man [Sierra] over Davidson in this instance, so his gender discrimination claim fails." *Id*. Caravan does concede, though, that Davidson can base his failure to promote claims on § 1981, "which has a four-year statute of limitation, making all three failure to promote claims timely–and [leaving] only his Title VII *race* discrimination claim for failing to promote him in March 2017 (over Sierra)." *Id*. Under either statute, Davidson must show that he was as qualified or more qualified than Ratty, Zahedi and Sierra, and that he was passed over for those promotions *because of* his race. The Court concludes that he fails to do so, and so his race discrimination claims fail under either statute.

his testimony permit a reasonable jury to conclude he was more qualified. Moreover, Davidson's

evidence does not establish pretext, as he has no evidence that Caravan's decision to hire Ratty

based on her qualifications was pretextual." *Id*.

**2. Promotion of Omid Zahedi.**

As to the promotion of Zahedi, Caravan presents the following argument:

Zahedi was hired by Caravan as Sanitation Manager in February 2016. Davidson
had–by that time–only about one year of experience managing hourly employees.
Zahedi had had [sic] over 20 years of management experience, including
experience in Human Resources. His management experience, then, well
surpassed Davidson's, and he was hired for this reason. Again, Davidson cannot
demonstrate that he was as qualified or more qualified than Zahedi or that
Caravan's stated reason for hiring Zahedi is pretextual.

Brief in Support, p. 14. Davidson does not dispute Caravan's factual assertions regarding

Zahedi's qualifications. As Caravan correctly points out, the only statement Davidson makes to

show that he was as qualified or more qualified than Zahedi is his assertion that Zahedi "never

worked in a facility such as GM[]" (Plaintiff's Appendix, p. 4). But Caravan insists that

"Davidson's evidence ignores that Zahedi had over 20 years of management experience,

including in Human Resources. At the time Zahedi was hired Davidson had about one year of

supervisory experience. Caravan's decision to prioritize Zahedi's extensive management

experience over Davidson's experience working for Caravan (but in largely non-supervisory

roles) is not evidence of discrimination." Defendant's Reply, p. 7 (internal citations to record

omitted).

**3. Promotion of Sierra.**

Caravan presents the same argument in response to Davidson's contention that he was as

qualified or more qualified than Roger Sierra. Caravan argues as follows:

Davidson also states–with no facts to support his assertion–that Sierra "did not have [Davidson's] qualifications." Conclusory assertions that are not grounded in specific facts cannot defeat summary judgment. . . . In any event, Davidson's assertion is incorrect. Sierra not only had experience working in a GM plant, but also had management experience *and* had a Bachelor's degree. Additionally, Sierra was a Union Chairman for many years and Daniel Tingley, the hiring manager, wanted someone who knew how to work with Union leadership. Again, Davidson presents no evidence to establish [that] Caravan's reliance on Sierra's qualifications–which were not inferior to Davidson's, despite his unsupported conclusions–was a pretext for discrimination.

*Id*.

Caravan is right. Davidson's failure to promote claims fail because they are based solely on his subjective opinion and conclusion that he was as qualified or more qualified than Ratty, Zahedi or Sierra. Davidson presents no evidence to refute Caravan's proffered, non-discriminatory reason for promoting those three individuals over him. Davidson concedes that he does not have a college degree and he does not dispute that Ratty, Zahedi and Sierra all had degrees *and* more supervisory or other workplace experience than he did. Davidson's failure to promote claim is based on his subjective belief that he was more qualified–or more to the point, more deserving–than the three non-Black individuals and therefore Caravan's refusal to promote him must have been based on his race.

Davidson's failure to promote claim fails to survive summary judgment because he fails to establish that he was as qualified or more qualified than the individuals hired, or that Caravan's reasons for hiring those other individuals were pretextual. Once again, the well-established principle applies: speculation and conjecture cannot defeat summary judgment, nor can a "mere scintilla" of evidence. Davidson has nothing else, and so Caravan is entitled to summary judgment on Davidson's failure to promote claims.

**B. Disparate pay.**

As stated above, Davidson alleges that "similarly situated non-black/non-African American and female employees" were paid more than him. Plaintiff's Appendix, p. 12. Davidson contends that he "requested on numerous occasions to be returned to an hourly pay instead of a salary pay or to be compensated at the same rate as similarly situated non-black and/or female employees, but [Caravan] denied his requests." *Id*.

Caravan argues that Davidson is flat-out wrong–both as to his assertion that he was paid less than other employees and his assertion that Caravan denied his alleged repeated requests to be returned to hourly pay. Caravan states as follows:

> Davidson was one of the highest paid Shift Supervisors, and made more than several white Shift Supervisors.[4] Of the Shift Supervisors employed from 2014 to 2017, five (including Davidson) were paid an annual salary. Three of these five employees are white. Davidson made more than [all] of them at $41,600. That is, Davidson made over $4,000 more per year than any other salaried Shift Supervisor.

Defendant's Brief in Support, p. 15 (internal citations to record omitted). Furthermore, Caravan points out the following:

> Despite making the highest salary, Davidson argues Caravan should have allowed him to return to hourly pay *while maintaining his effective hourly rate of $20.00*. Davidson was told that if he returned to hourly pay and became eligible for overtime, his hourly rate would decrease because he was already at the top of the pay scale. Nearly every supervisor who was paid hourly, including the white Shift Supervisors, made between $17.00 to $18.50 per hour. Not one hourly paid shift supervisor made $20.00 or more per hour. Thus Caravan did not refuse to return Davidson to hourly pay; rather, it gave him a choice to remain at the $41,600 salary–at the top of the pay scale–or return to hourly pay, but drop his effective hourly rate. Davidson chose to remain a salaried employee. In sum, there is no

---

[4] In support of its position, Caravan submits the affidavit of Bridget Foco, Human Resources Manager, and Exhibit 1 to Foco's affidavit, which is a copy of Caravan's Supervisor Pay Spreadsheet. *See* Defendant's Brief in Support (ECF 21-4).

evidence to suggest that Caravan discriminated against Davidson by not returning him to hourly pay at $20.00 per hour. With respect to pay raises, Davidson has presented no evidence that any similarly situated employee was provided a pay raise when he was not. Again, he was told that he was not being given a raise because he was already at the top of the pay scale. This statement is supported by the submitted evidence, which establishes Davidson made *more* than several white Shift Supervisors. His equal pay claim is therefore legally and factually baseless[.]

*Id.*, pp. 15-16 (citing Foco declaration and Davidson deposition) (italics in original).

Davidson's argument in response is a curious one. He "acknowledges that he was paid a higher salary th[a]n others; however, he would have made more money had he been allowed to go hourly and work overtime." Plaintiff's Response, p. 5. Caravan replies to this argument as follows:

Davidson's argument misses the mark. Davidson must establish that he was paid *less* than similarly situated employees because of his race and/or gender, not that he "could have made more." The evidence demonstrates that he was *not* paid less than other Shift Supervisors. Of the five salaried Shift Supervisors who were employed during Davidson's employment (three of which are white), Davidson had the highest salary.

Defendant's Reply Brief, p. 8. Once again Caravan is correct. Davidson fails to present any evidence that he was paid less than similarly situated employees not in his protected class. In fact, the unrefuted evidence submitted by Caravan shows otherwise. Like his other claims, Davidson's disparate pay claim is based not on evidence, but on his opinion, speculation and conjecture that his requests to return to an hourly pay rate were denied because he is Black or male. There is no genuine issue of fact here that requires a trial and Caravan is entitled to summary judgment on Davidson's disparate pay claim.

**III. Discriminatory discharge claim.**

As to his alleged discriminatory termination, Davidson contends as follows:

On or about June 13, 2017, [Caravan] fired [Davidson], claiming he had been terminated because of attendance issues[.] [Davidson] denies the allegation, and contends that the proffered reason for termination was false and pretextual.

Plaintiff's Appendix, p. 13 (quoting Charge of Discrimination). Davidson elaborates on his wrongful discharge claim in his affidavit, in which he explains as follows:

I have reviewed Caravan's Employee Handbook . . . particularly the part about poor performance and excessive tardiness. At page 48 of the Handbook, it states that "continual, excessive, or unexcused absences or tardiness will result in progressive disciplinary actions up to and including discharge." Prior to my vacation in June 2017, I was approached by Justin Browning (second shift supervisor), we discussed switching shifts and received approval from Roger Sierra that I would return from vacation on second shift. I had received a "final warning" (according to Defendant) and was to return to work on June 4, 2017, but I had already been approved for vacation from June 4, 2017, through June 12, 2017. I returned to work on June 13, 2017, as a result of arrangements that I had made; however, my employment was terminated . . . even though I had not been counseled or written up with respect to "continual, excessive, or unexcused absences . . ." as set forth in the Employee Handbook[.]

Affidavit of Darrell Davidson, (ECF 27-1), p. 2, ¶ 4. Davidson "claims that the circumstantial evidence strongly supports a showing of discriminatory discharge. Plaintiff was not a repeat violator of the attendance policy. Furthermore, he was never warned that he was about to be discharged because of attendance. . . . Furthermore, the reasons cited by Caravan for terminating Plaintiff is [sic] mendacious and certainly pretextual. Plaintiff had an arrangement with Justin Browning and Roger Sierra that he would come back to work on June 13, 2017, as he was going to switch shifts with Just[in] Browning. This was known by Roger Sierra. In other words, Roger Sierra set-up Plaintiff for termination by disallowing the 'switch' in shifts but never telling Plaintiff that he had to come back to work by June 12, 2017. This is absolutely race discrimination. These suspicious circumstances absolutely indicate race discrimination. Justin Browning is white, Plaintiff is black; Roger Sierra told Justin Browning that the switch was off,

but failed to tell Plaintiff, causing Plaintiff to be terminated." Plaintiff's Response, p. 6.

So Davidson contends he was fired for failing to show up for work, when in fact he did no such thing "as a result of arrangements that [he] had made" with Roger Sierra, his supervisor at the time. That assertion, coupled with his assertion that Caravan had not followed the attendance policy set out in its Employee Handbook, is the basis for Davidson's wrongful discharge claim.

The events that led to Davidson's firing began when Davidson left early for a previously scheduled Florida vacation. Davidson explained it this way in his deposition:

> Plaintiff had made a request for paid time off from June 4, 2017 to June 12, 2017, and this request was approved. Plaintiff was allegedly notified about a "Warning Notice" dated June 13, 2017[,] which he did not receive until his return on June 13, 2017. Anytime that plaintiff had to leave early or on a family emergency, he notified the company. Plaintiff called through the attendance line to report when he would be off work. Plaintiff could not follow the instructions contained in the [Employee] [H]andbook for calling off because it was an emergency. Plaintiff was going through some family emergencies and needed extra time to bond with his family. Nevertheless, Plaintiff was terminated. However, Plaintiff had an arrangement that he would report to work on second shift after his vacation–Plaintiff believed that was satisfactory.

Plaintiff's Appendix, pp. 9-10 (internal citations to Davidson's deposition omitted).

Caravan's recitation of the facts pertaining to Davidson's termination presents a different picture –and a more complete one. Caravan recounts the facts as follows:

> Davidson testified that he was supposed to report to second shift when he returned to work from his vacation, but his manager, Roger Sierra, understood that Davidson would switch shifts with Justin Browning, the second shift supervisor, at some undetermined time in the future. (Ex. A, pp. 118:20-119:9, 130:20-133:1; Ex. F, Declaration of Sierra, ¶ 10.) Thus, when Davidson again did not show up for third shift on June 12, 2017, Sierra and Daniel Tingley decided his employment should be terminated. (Ex. E, Declaration of Tingley, ¶¶ 10-14; Ex. F, Declaration of Sierra, ¶¶ 6-11.) Davidson attempts to cast doubt on Caravan's stated reason for his termination by alleging that Sierra knew Davidson and

Browning were to switch shifts following Davidson's vacation, but Sierra later
told Browning (but not Davidson) that they would switch shifts at another time. In
other words, Davidson contends that Sierra did not honestly believe that Davidson
had missed yet another shift. Even assuming this is true (Caravan denies that it
was ever agreed that Davidson would switch shifts after his vacation), this is not
evidence of race or gender discrimination as Browning is African American and
male. (Ex. A, pp. 135:3-4.) Thus, Davidson does not have evidence that a member
outside of his protected class was treated more favorably; rather his allegation is
that Sierra treated another African American male more favorably than him. This
is not evidence of discrimination.

Defendant's Brief in Support, p. 17. Caravan also takes issue with Davidson's assertion that he

had never violated the attendance policy. Caravan notes that Davidson "was absent from work on

multiple occasions beginning in early 2017, and he failed to properly report those absences under

Caravan's attendance policy." *Id.*, p. 16. Caravan points out that Davidson admitted this fact in

his deposition. *See* Davidson Deposition (ECF 21-2), pp. 27-28 (deposition pp. 125-130). In his

testimony, Davidson did in fact concede that he failed to adhere to the attendance "call-in" policy

on several occasions in April and May 2017. *Id.* He also conceded that he left for his Florida

vacation early because he had an "ongoing issue with my family. My–everything was in disarray.

I had some problems going on." *Id.* When asked why he did not follow the dictates of the

attendance policy set out in the Employee Handbook, Davidson answered that "I told them that it

was an emergency, and that I couldn't get to–I–I just didn't follow through with the employee

handbook." *Id.*

Caravan states that when Davidson failed to return for his shift on June 12, 2017, Tingley

and Sierra decided to terminate Davidson's employment. While Davidson concedes that he did

not show up for work (on third shift) on June 12, he insists it was not an attendance violation

since he, Browning and Sierra had an agreement that Browning and Davidson would switch

shifts. *Id.*, p. 28. But Davidson still maintains his termination was discriminatory based on his contention that Sierra pulled the rug out from under him by postponing the shift change and not informing Davidson about the change before he returned to work. But even assuming the truth of Davidson's version of the circumstances, he fails to present any evidence that his termination was based on his race. And, as Caravan points out, notwithstanding Davidson's statement in his brief that "Browning is white," Browning is actually African-American, as Davidson acknowledged in his deposition testimony. *See* Davidson Deposition (ECF 21-2), p. 29 (internal page number 135) ("Q. What's Justin Browning's race? A. Justin Browning? He's a black gentleman."). As Caravan states, "this is not evidence of *race* or *gender* discrimination as Browning is African American and male. Thus, Davidson does not have evidence that a member outside of his protected class was treated more favorably[.]" Defendant's Brief in Support, p. 17.

Caravan concludes its argument on Davidson's wrongful termination claim as follows:

Simply casting doubt on the fairness of the termination decision is not enough. The evidence must show that the employer is creating a false reason as pretext for discrimination, not pretext for some other motivation. *See Hitchcock v. Angel Corps., Inc.*, 718 F.3d 733, 740 (7th Cir. 2013) ("Of course, a showing of pretext alone is not enough; the plaintiff must also show that the explanations are a pretext for the prohibited animus.") The fact that Sierra allegedly told Browning, but not Davidson, that they were no longer switching shifts suggest, if anything, that Davidson was allegedly treated differently for a reason other than his race or gender. Davidson presents no other evidence that would allow a reasonable jury to conclude that he was terminated because of his race or gender. In fact, his testimony establishes that even he did not believe his termination was related to his race or gender. When asked why he believed he was terminated, Davidson responded:

I believe that from Mindy Ratty to Omid Zahedi to Roger Sierra that they were targeting me. There was some things that – I accomplished a lot of things as a supervisor. And I felt that some issues that came up, they wasn't – they felt that I was outshining them. That's how I felt. Anytime an issue came up within the plant, the General Motors people or supervisors were

emailing me. In return I was emailing Daniel or Lori and letting them know these are issues. I made it a point to create relationships with the General Motors hierarchy, so that they would know who I was. I made it a point to complete my tasks that were given to me and also that was asked of me from the General Motors people. I feel that it was a jealousy thing that worked out because, like I said in my earlier testimony, I was promoted by Lori, you know, and I think it was a time – it was times where issues would come along with the employees or the other supervisors and they wouldn't call her, they would call me. And I think that rubbed her the wrong way.

(Ex. A, pp. 135:5-136:4.) This testimony does not suggest that Davidson was allegedly "targeted"because he was a member of a protected class. Rather, Davidson believes he was singled out because he outshone other management employees and they were "jealous" of him. This is not an actionable claim under Section 1981 or Title VII.

Defendant's Brief in Support, pp. 17-18.

To survive summary judgment on his wrongful discharge claim, Davidson must establish that: (1) he is a member of a protected class, (2) he performed reasonably on the job in accordance with his employer's legitimate expectations, (3) despite his reasonable performance, he was subjected to an adverse employment action, and (4) similarly situated employees outside of his protected class were treated more favorably by the employer. *Tucker v. Express Scripts Holding*, 2016 WL 2643737, at *4 (S.D. Ind. May 10, 2016). Davidson presents no evidence to support, or even raise a genuine issue of fact about, his wrongful discharge claim. He admits that he failed to follow the attendance policy "call-in" requirement on several occasions and failed to show up for his shift on June 12, 2017, when his approved vacation time ended. Therefore, he fails to show that 1) he was performing his job duties, i.e., that he was meeting his employer's "reasonable expectations," or 2) that a similarly situated employee not in his protected class[es] was treated more favorably. For the same reasons, he has also failed to show that Caravan's

proffered, non-discriminatory reason for firing him was pretextual. Davidson's evidence, at best, shows that there was confusion about whether he would return to work on second or third shift. But even if Caravan's decision to fire him was rash or misguided, that does not mean the company's decision was discriminatory. As this court and others have noted many times, federal courts are "not here to second guess managerial decisions." *Barile v. Lutheran Health Network of Indiana, LLC*, 2019 WL 4415542, at *11 (N.D. Ind. Sept. 16, 2019) (citing *Traylor v. Brown*, 295 F.3d 783, 790 (7th Cir. 2002) ("[W]e do not sit as a super-personnel department over employers scrutinizing and second-guessing every decision they make[.]")). Once again, Davidson fails to muster sufficient evidence to establish the essential elements of a wrongful discharge claim and Caravan is entitled to summary judgment on that claim.

### IV. Retaliation claim.

Finally, Davidson alleges that Caravan retaliated against him, although as Caravan correctly observes, "his Complaint is unclear how he was subject to retaliation." Defendant's Brief in Support, p. 18. Davidson claims that the incident giving rise to his retaliation claim occurred *after* he was terminated. His recitation of the facts underlying this claim are as follows:

> Plaintiff believes that he was retaliated against because he had protested discriminatory treatment in the workplace. After his termination from Caravan, Plaintiff took a year off but went back to the General Motors Plant as a General Motors employee. After working three (3) straight training days in a row, Plaintiff was not allowed in the building, because Caravan interfered with his job and stated that he was banned by a Caravan representative for allegedly making threatening remarks towards Caravan, which was not true. A GM Union Rep[resentative] contact security and stated, "Caravan is fucking with Darrell Davidson. This man has done nothing wrong, he [is] allowed to come in the building anytime he wants." After that, Caravan's retaliatory efforts were thwarted, and Plaintiff was allowed to keep on working for GM (where he works today).

Plaintiff's Appendix, p. 10. Addressing this claim in his response brief, Davidson contends that

"[t]he circumstantial evidence shows that Caravan did discriminate–intentionally–against

Plaintiff. A year after Plaintiff was terminated from Caravan, he got a job working at the GM

Fort Wayne Assembly Plant as a GM employee. Even though a year had passed after his

termination, during which time Plaintiff had leveled a Charge of Discrimination against Caravan,

Caravan placed a Stop Order Log on the Plaintiff which prohibited him from returning to the Fort

Wayne Assembly Plant, even though there was no reason or cause for Caravan to do so."

Plaintiff's Response, p. 6. Davidson, then, is arguing that by placing him on a "Stop Order Log,"

Caravan committed an act of retaliation against him *after* he was terminated. This post-

employment action was retaliatory, Davidson contends, because it came after he had filed his

Charge of Discrimination.

Caravan argues that Caravan responds to Davidson's argument as follows:

At the outset, Davidson fails to respond to Caravan's argument that his "post-
[employment]-retaliation claim" is outside the scope of his Complaint, as he never
amended his Complaint to include this claim. Moreover, contrary to Davidson's
assertion, there *was* a reason to place him on the Stop Order Log: because he was
a member of Caravan's management, he could have accessed GM's network until
his credentials were removed, leading to him to likely be placed [sic] on the log
following his termination.[5] And finally, Davidson's name being included on the
Stop Order Log is not an adverse action because GM immediately removed him
from the list when he reported to the plant for his first day of work for GM.
Because Davidson did not miss any work nor was he otherwise impacted by being
placed on the Stop Order Log, this act does not rise to the level of retaliation. *See
Lewis v. Wilkie*, 909 F.3d 858, 870 (7th Cir. 2018) (holding an adverse action in

---

[5] Daniel Tingley explains in his affidavit that placing Caravan supervisors and managers
on a "Stop Order Log" is often standard procedure when an employee is terminated: "Caravan
notifies both GM's labor department and the onsite security at the Fort Wayne Assembly Plant
when an employee has been terminated." Declaration of Daniel Tingley (ECF 21-6), ¶ 16.
"Davidson was likely placed on the Stop Order Log because he was a member of management
and therefore could have accessed GM's network until his credentials were removed." *Id*.

the retaliation context must produce a material injury or harm).

Defendant's Reply, p. 10. Caravan, then, does not deny that Davidson was placed on a "Stop Order Log," but insists that it was done for a legitimate, non-discriminatory reason. And, given that Davidson was able to begin his job at GM as planned and suffered no adverse employment action or other harm as a result of having been placed on a "Stop Order Log," he cannot maintain a claim for retaliation.

In addition to the arguments advanced by Caravan, there is another problem with Davidson's retaliation claim. As stated above, he claims that Caravan placed him on a "Stop Order Log" in retaliation for the filing of his Charge of Discrimination. He fails to present any evidence, however, that the "Stop Order Log" was issued *after* he filed his Charge of Discrimination. In fact, the Log itself contains an entry in a column titled "Date Posted" indicating that Davidson was placed on the Log on "6/15/17," which was two days after Davidson was fired and several weeks *before* he filed his Charge of Discrimination on July 7, 2017. Davidson doesn't actually state or claim that the Log was issued *after* he filed his Charge of Discrimination, even though the wording in his brief implies exactly that. On closer scrutiny, all Davidson claims is that when he reported for his first day of work at GM he learned that he was on a "Stop Order Log." Obviously, if Caravan placed Davidson's name on the Log on June 15, 2017, it could not have done so in retaliation for the Charge of Discrimination filed weeks later.

As the Seventh Circuit has explained, to establish a *prima facie* retaliation claim, a plaintiff "may proceed under either the direct or indirect methods. *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 404 (7th Cir. 2007), aff'd, 553 U.S. 442, 128 S. Ct. 1951, 170 L. Ed. 2d 864

(2008) (citing *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003)). "Under the direct method, [a plaintiff] must present direct evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two. *Id*.; *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006). Under the indirect method, he must show that after opposing the employer's discriminatory practice only he, and not any similarly situated employee who did not complain of discrimination, was subjected to a materially adverse action even though he was performing his job in a satisfactory manner. *Id*. (citing *Sylvester v. SOS Children's Villages Ill., Inc*., 453 F.3d 900, 902 (7th Cir. 2006)). "Thus, the indirect 'method of establishing a *prima facie* case requires proof both of similarly situated employees and of the plaintiff's performing his job satisfactorily.'" *Id*. (quoting *Sylvester*, 453 F.3d at 902).

Davidson fails under *either* the direct or indirect method because he fails to even allege, let alone present evidence to show, that any similarly situated employee was treated more favorably and fails to show that he suffered a "*materially* adverse employment action" (as opposed to a very temporary inconvenience). Instead, Davidson merely alleges that a year after he was fired he began working directly for GM and, on his first day there, discovered that he was on a "Stop Order Log." That same day, the matter was resolved and Davidson was allowed to begin his employment at GM (where, he says, he still works today).

It is well-established that "an adverse action in the . . . retaliation context must produce a material injury or harm, and that unfulfilled threats do not meet that standard." *Lewis v. Wilkie*, 909 F.3d 858, 870 (7th Cir. 2018) (citing *Burlington Northern and Sante Fe Ry. Co. v. White*, 548 U.S. 33, 67, (2006) (the anti-retaliation provision "protects an individual not from all

retaliation, but from retaliation that produces an injury or harm"); *Poullard v. McDonald*, 829 F.3d 844, 856-57 (7th Cir. 2016) (holding threats of unspecified future discipline were not materially adverse actions); *Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009) (affirming "[f]ederal law protects an employee only from retaliation that produces an injury"); *Dunn v. Wash. Cty. Hosp.*, 429 F.3d 689, 692 (7th Cir. 2005) (holding statements implying an employer would do what he could to impede the plaintiff's career did not cause any injury and were not adverse actions)).

One last point. Even though Davidson's retaliation claim appears to be based solely on a single post-employment action, Caravan points out that *if* he is attempting to argue that any of the *prior* adverse actions he allegedly endured–including his claims of disparate pay, failure to promote and discriminatory discharge–were retaliatory, his claim would still fail since none of the decision makers involved in his termination knew anything about his alleged complaints to June Jordan. As Caravan points out, Davidson conceded in his deposition that the *only* complaints he lodged in the years he worked at Caravan occurred when he spoke to Caravan Human Resources employee June Jordan in 2013 or 2014. Defendant's Brief in Support, p. 19 (citing Davidson Deposition). Davidson admitted in his deposition that any discussions he had with Jordan occurred "while he was in the corporate support role (i.e., before October 2014 when he became a Shift Supervisor)." *Id.* Davidson further conceded that he did not lodge any complaints about discrimination or harassment after that. He insists that the reason he did not complain was because he believed it would be futile to do so. The relevant portions of Davidson's deposition include the following:

Q. So is it my understanding that you told June Jordan [you were experiencing

discriminatory treatment]?

A. Yes, I spoke to June Jordan about this, yes.

Q. So this was back when you were in corporate role?

A. Yeah, between corporate and supervisor role. . . .

Q. Any other time that you complained about discrimination?

A. No, not that I can recall.

Davidson Deposition (ECF 21-2), p. 31 (internal page number 142). When asked if he had ever

lodged any other complaints about harassment or discrimination, Davidson conceded that he did

not, because he felt that doing so would be futile:

> A. HR had a tendency of not following through. They had a lady that was there.
> Her name was June Jordan, and me and her had conversations about my position
> and about me being targeted to lose my job. And I reported everything–I reported
> on a verbal basis. And we might have passed through some emails to her. And
> nothing was made of it once she turned in her reports to the corporate offices, so I
> had gave up hope.

*Id.*, p. 15 (pp. 62-63).

Davidson's retaliation claim fails because he submits no evidence that the decision

makers who fired him had any knowledge of the complaints he expressed to June Jordan several

years before, and he conceded that he did not lodge any complaints of discrimination after that. A

plaintiff's "feelings of futility or unpleasantness do not alleviate h[is] duty to bring h[is]

mistreatment to the [Defendant's] attention." *Durkin v. City of Chicago*, 341 F.3d 606, 612 (7th

Cir. 2003) (citing *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 813 (7th Cir.1999)). Furthermore, "'an

employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the

employee's duty to alert the employer to the allegedly hostile environment.'"

*Hunt v. Wal-Mart Stores, Inc.*, 931 F.3d 624, 631 (7th Cir. 2019) (quoting *Porter v. Erie Foods Intern.*, 576 F.3d 629, 638 (7th Cir. 2009)).

Caravan argues that "[a]ssuming that Davidson is claiming all of the alleged adverse actions mentioned in his complaint were retaliatory (disparate pay, failure to promote, suspension, and termination), his retaliation claim fails at the starting gate because he cannot demonstrate that any of the individuals involved in these personnel actions were aware of his alleged protected activities. . . . Davidson presents no evidence to show that June Jordan ever reported his complaints to any other employee at Caravan. In fact, his testimony was [that] he did not know whether she reported his concerns, and Caravan denies that its management was informed of his alleged complaints." Defendant's Brief in Support, p. 19. Caravan presents as evidence the affidavits of Foco, Steiner, Tingley, and Sierra, all of whom state that they knew nothing about Davidson's alleged prior complaints when they made employment decisions that he considered discriminatory. *Id.* (citing Declaration of Bridget Foco (ECF 21-4), ¶¶ 4-5 ("I have no knowledge that Darrell Davidson made complaints to June Jordan about his employment with Caravan. Lori Steiner was not involved in the decision to terminate Darrell Davidson. That decision was made by Daniel Tingley and Roger Sierra, in conjunction with me as the Human Resources representative."); Declaration of Lori Steiner (ECF 21-5), p. 2, ¶ 5 ("I have no knowledge that Darrell Davidson made complaints to June Jordan about his employment with Caravan. . . . I was not involved in the decision to terminate Davidson's employment."), *id.*, p. 3, ¶ 9; Declaration of Daniel Tingley (ECF21-6), p. 2, ¶ 5 ("I have no knowledge that Darrell Davidson made complaints to June Jordan about his employment with Caravan."); Declaration of Roger Sierra (ECF 21-7), p. 2, ¶ 5 ("I have no knowledge that Darrell Davidson made complaints

to June Jordan about his employment with Caravan.").

Davidson presents no evidence to refute these assertions. Caravan argues that "[w]ithout knowledge of Davidson's alleged protected activity, none of the alleged employment actions could have been taken *because of* his protected activity. *See Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1122 (7th Cir. 2009) ("In order to establish retaliation . . . , the employer must have actual knowledge of the protected activity in order for its decisions to be retaliatory; it is not sufficient that an employer could or even should have known about the employee's complaint."); *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 669 (7th Cir. 2006) ("[I]f an employer did not know the plaintiff made any complaints, it cannot be trying to penalize him for making them."). Defendant's Brief in Support, p. 19. *See also*, *Moultrie v. Penn Aluminum Int'l, LLC*, 2013 WL 1857150, at *5 (S.D. Ill. May 2, 2013), *aff'd*, 766 F.3d 747 (7th Cir. 2014) ("To establish retaliation pursuant to Title VII, the employer must have had actual knowledge of the protected activity in order for its decisions to be retaliatory[.]").

Caravan also points out that "Davidson's complaints were allegedly made sometime in 2013 or 2014, but he was not suspended or terminated until June 2017. This timing makes any possible causal connection between his termination and protected activity tenuous at best. *See Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 (7th Cir. 2014) ("[T]he inference of causation weakens as the time between the protected expression and the adverse action increases[.]"). *Id.*, p. 20. In *Carlson*, the Seventh Circuit also explained that "[i]f the best a plaintiff can do is allege that he engaged in protected activity and then, years later, the employer took an adverse action against him, the claim may not be permitted to proceed." *Carlson*, 758 F.3d at 828-29 (citing *Carmody v. Board of Trustees of Univ. of Illinois*, 747 F.3d 470, 480 (7th Cir. 2014)

(unexplained three-year gap between employee's report against another employee and his termination made state-law retaliation claim implausible[.]")).

The unrefuted evidence in this case shows that the decision makers who took the adverse actions against Davidson were not aware of the complaints of harassment or discrimination that Davidson conveyed to Jordan years earlier. Therefore, even assuming Davidson is attempting to base a retaliation claim on adverse actions taken *during* his employment, his claim still fails since he does not present any evidence to refute Caravan's position and because he acknowledged that the only "protected activity" he engaged in while employed consisted of conversations with June Jordan two or three years before those actions took place. In sum, even though Davidson does plead or argue that the actions taken against him during his employment constituted retaliation, such an argument would "fail from the starting gate," as Caravan puts it, since Davidson admitted that he did not engage in any protected activity between the time he spoke with June Jordan and the date of his termination. For all of the reasons just discussed, Davidson has failed to establish the necessary elements of a retaliation claim and Caravan is entitled to summary judgment on that claim.

## CONCLUSION

Davidson alleges that he was subjected to several adverse employment actions, spread out over several years, during his tenure at Caravan. He claims that each and all of them–the reprimands and write-ups, Caravan's decisions not to promote him to Housekeeping Manager, and his termination for attendance violations–were the result of intentional race or gender discrimination. Caravan, however, has presented evidence to refute each of Davidson's assertions. The Court has considered and addressed each of Davidson's claims in detail (which is

38

why this order is 40 pages long). But while Davidson's allegations and arguments necessitated such a detailed review of the facts and evidence, the Court's decision today is based, as it must be, on the evidence as a whole. As stated out the outset, this Court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe," which is what Davidson's arguments implicitly ask the Court to do. As the Court also noted above, federal courts "do not sit as a super-personnel department over employers scrutinizing and second-guessing every decision they make[.]" *Traylor v. Brown*, 295 F.3d 783, 790 (7th Cir. 2002); *see also*, *Pollard v. Rea Magnet Wire Co.*, 824 F.2d 557, 560 (7th Cir. 1987) ("A district judge does not sit in a court of industrial relations."). Instead, "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself. . . . Relevant evidence must be considered and irrelevant [or inadmissible] evidence disregarded." *Ortiz v. Werner*, 834 F.3d at 765. The standard of review enunciated by the Seventh Circuit in *Ortiz* mandates that trial courts employ what this Court has referred to as a "30,000-foot view" of the evidence in discrimination cases to determine whether a reasonable jury could find in favor of the non-movant. In this case, the admissible evidence would not permit a reasonable jury to find in Davidson's favor on any of his claims. In fact, the evidence refutes Davidson's claims and shows that they are–in the end–based only on his subjective and conclusory belief that every adverse action he suffered was the direct result of intentional discrimination. When the evidence in this case is "considered as a whole," it is clear that Caravan is entitled to summary judgment for the reasons it summarized in its brief in support. That passage, quoted above at page two of this order, bears repeating:

Davidson presents no *admissible* evidence of racial or sexual harassment; . . .

> Davidson also never complained of the alleged harassment he experienced, so there is no basis for employer liability. His failure to promote claim fails because Davidson cannot demonstrate that the individuals hired into the jobs he sought were less qualified than him. In fact, each was *more* qualified than him. Davidson's disparate pay claim is likewise factually baseless: Davidson was paid *more* than most of the other shift supervisors, including those outside of his protected classes. With respect to his discriminatory discharge claim, the evidence shows he was terminated for legitimate attendance issues. . . . Finally, his retaliation claim fails because none of the managers who were involved in the personnel actions he complains of were aware of his alleged protected activity.

Defendant's Brief in Support (ECF 21), p. 2 (italics in original). The Court's review of "the evidence as a whole" leads it to the same conclusion: that Davidson fails to establish a genuine issue requiring a trial as to any of his claims.

For all of the reasons set forth above, the motion for summary judgment filed by Defendant Caravan Facilities Management is GRANTED. The Clerk of the Court is instructed to enter judgment in favor of the Defendant and against the Plaintiff.


Date: January 17, 2020.

          /s/   William C. Lee   
                William C. Lee, Judge
                   U.S. District Court
            Northern District of Indiana

.